UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                              :
RONNIE A. HERSHMAN, M.D.,       :      06 Civ. 5604 (RJH)
                              :
              Plaintiff,       :
                              :      **MEMORANDUM**
       - against -          :      **OPINION AND ORDER**
                              :
UNUMPROVIDENT CORPORATION
and PAUL REVERE LIFE INSURANCE
COMPANY,
                              :
             Defendants.     :
                              :
-------------------------------------------------------------x

Richard J. Holwell, District Judge:

      Dr. Ronnie A. Hershman brings this breach of contract action alleging that his inability to practice invasive cardiology entitles him to "total disability" benefits under an occupational insurance policy. The parties cross-moved for summary judgment after completion of discovery. For the reasons stated below, defendants' motion is granted and plaintiff's motion is denied.

## BACKGROUND[1]

      Beginning in 1989, Dr. Hershman practiced invasive cardiology in the catheterization laboratory of St. Francis Hospital in Roslyn, New York. (Pl. 56.1 ¶ 8.) "Invasive cardiology," as plaintiff defines it, is "a specialty within the field of cardiology involving the insertion of instrumentation into the human body [through a catheter] to examine and diagnose the structures of the heart and to perform certain therapeutic procedures on various coronary arteries if blockages in the arteries exist." (Pl. Opp. Br. at 1.) The specialty requires extensive training, which Hershman acquired through a fellowship in invasive cardiology at Mount Sinai Medical

---

[1] The facts in this section are construed in the light most favorable to plaintiff. They are drawn from the parties' Rule 56.1 submissions and from the evidence submitted by the parties if not included in the 56.1 submissions.

Center.  He had previously completed a residency and fellowship in general cardiology at the same institution.  (Pl. 56.1 ¶ 1, 3.)  Invasive cardiac procedures include, among others, angioplasty and cardiac catheterization.  (Pl. 56.1 ¶ 6.)  Between 1989 and 2003, plaintiff performed, on average, about 1,000 invasive cardiac procedures per year, more than the vast majority of physicians in the United States who perform such procedures.  (Pl. 56.1 ¶ 10.)

Alongside his hospital work at St. Francis, Hershman also practiced cardiology from private medical offices.  There, he performed the patient consultations, examinations, analysis, and other non-operating duties that comprised, by his own account, a substantial portion of his practice.  (Pl. 56.1 Ex. G at 00939, Ex. S at 17:6 – 18:4, 30:6-18.)  Dr. Hershman conducted this office work as a member of a large group cardiology practice until 2000, when he founded his own private practice, Ronnie A. Hershman M.D., P.L.L.C., with an office in Lake Success, N.Y. (Pl. 56.1 ¶ 24.)  He continues to practice cardiology from that office today.

In 1994, Hershman purchased an occupational insurance policy from The Paul Revere Life Insurance Company ("Paul Revere").  The policy insured him against the possibility that a "total disability" or "residual disability" should prevent or impede performance of his "occupation." (Pl. 56.1 Ex. C.)  It contains the following pertinent definitions:

> "**Your Occupation**" means the occupation or occupations in which You are regularly engaged at the time Disability begins.
>
> "**Total Disability**" means that because of Injury or Sickness…you are unable to perform the important duties of your occupation…
>
> "**Residual Disability**"…means that due to Injury or Sickness which begins prior to age 65…You are unable to perform one or more of the important duties of Your Occupation…

In the event of total disability, the policy provides for a monthly benefit payment of $20,000 for the duration of the disability, up to age 65 (until December 2023, for Dr. Hershman).  *Id*. at 3.

For a residual disability, the policy entitles Hershman to benefits corresponding to the percentage of total earnings lost, so long as the disability causes a threshold earnings decline of at least 20%. *Id.* at 8.  The policy does not provide benefits for a partial disability that results in less than a 20% earnings decline.  To maintain the policy, Hershman paid an annual premium of $8,942.  *Id.* at 3.

The policy documentation contains varied descriptions of Hershman's occupation.  In an application for coverage dated January 1, 1994, Hershman described himself as a "Physician—Catherizing [sic] + Angioplasty," who "specializ[ed] in cardiology." (Def. 56.1 Ex. 1.)  He also included the notation "Invasive Cardiology" in a space provided for additional details.  *Id.*  In a separate letter issued to clarify the policy's definition of "occupation," Paul Revere wrote that it understood Hershman's occupation "to be that of a specialist in the field of cardiology." (Pl. 56.1 Ex. A.)  The letter reiterated, however, that Hershman's "occupation" would be defined as "the occupation or occupations in which you are regularly engaged at the time disability begins," and noted that his ability to work "in some other occupation or specialty would not preclude the payment of Total Disability Benefits." *Id.*[2]

In late 2003, Hershman began to feel severe pain in his lower back, a condition likely caused and certainly aggravated by the heavy lead apron physicians must wear in the catheterization lab.  Wearing the apron, Hershman experienced numbness down his left leg and back pain so intense that he frequently had to rest in the middle of invasive procedures.  After attempting to work through the condition for several months, in January 2004 Hershman decided that his symptoms were interfering with his clinical judgment and that it was no longer safe for

---

[2] The parties debate whether this separately issued "specialty letter," or as plaintiff prefers, "letter endorsement," comprises part of the insurance contract.  However, because the policy clearly defines Hershman's "occupation" as the work he performed at the onset of disability, rather than by any occupation listed in the policy documents, the Court finds it unnecessary to decide this issue. *See Blasbalg v. Mass. Cas. Ins. Co.*, 962 F. Supp. 362, 369 n.2 (E.D.N.Y. 1997).

him to conduct invasive procedures.  Since then, he has not returned to the catheterization lab, though he continues to practice what he calls "consultative" cardiology, examining patients in his office.  (Pl. 56.1 Ex. F.)  For summary judgment purposes, defendants do not dispute that Hershman's condition is genuine and that it prevents him from performing invasive cardiac procedures.

Hershman filed a claim for total disability benefits under his policy in May 2004.  He noted on the claim application that he continued to work full-time as a "non-invasive" cardiologist.  (Pl. 56.1 Ex. E.)  After reviewing the report of a field representative who interviewed Hershman and examined his financial information, Paul Revere agreed in August 2004 to begin paying total disability benefits on the policy.  (Pl. 56.1 ¶¶ 42-43.)  In a letter communicating the decision, Paul Revere stated that it would make the payments under a "reservation of rights" and requested further information about Hershman's pre-disability occupational duties, including data breaking down the various cardiology services he provided his patients.  (Pl. 56.1 Ex. M.)  Subject to a continuing review of such information, Paul Revere made the $20,000 monthly payments until December 2005.  (Pl. 56.1 ¶ 46, Ex. N.)

As indicated, Paul Revere continued its investigation of Hershman's claim, requesting additional data by letter and calling Hershman to discuss its analysis of his billing records.  (Pl. 56.1 Ex. N, Ex. P.)  Sixteen months after it began payment, the insurer determined that Hershman was not "totally disabled" under the policy, pointing to billing records it believed showed that non-invasive cardiology had accounted for roughly 80% of Hershman's pre-disability revenues.  (Pl. 56.1 Ex. P. at 0004.)

Before the disability, Hershman divided his time between the hospital and his consultative office in Lake Success.  He spent each Tuesday at the hospital performing invasive surgeries.  During the rest of the week, he performed invasive procedures for two and a half hours at the hospital and saw patients in his office for eight hours.  (Pl. 56.1 Ex. S. at 19:19 – 22:5.)  Plaintiff estimated in his claim filings that, in total, he spent an average of 40 hours per week in his office and 28 hours at the hospital.  (Pl. 56.1 Ex. G.)  He now claims that he erred in making that estimate and that he in fact spent 50% of his time in the office and "50%…on invasive procedures in the hospital, rounds on patients in the hospital, and being on call."  (Pl. Counter 56.1 ¶ 28.)  He also was sole owner and supervisor of a non-invasive cardiac diagnostic laboratory, Long Island Cardiac Care, which he founded as a subsidiary of his independent practice in 2000.  The laboratory is located in a separate part of plaintiff's Lake Success office. (Pl. 56.1 Ex. S at 23:13-18.)  Despite his supervisory role, Hershman has never personally performed any of the testing procedures conducted in the lab.  (Pl. 56.1 Ex. S. at 132:3 – 133:5.) The lab employs fourteen medical professionals, technicians, and staff.  (Pl. 56.1 ¶ 25.)

Since the onset of his disability, Hershman, unable to perform invasive procedures, has practiced cardiology mainly from his office.  For the first post-disability year, he saw roughly 200 patients per week during regularly held office hours, 9:00am to 5:00pm, five days a week. (Def. 56.1 ¶ 38; Pl. Counter 56.1 ¶ 38.)  In 2005, he reduced his hours to about 30 per week, though there is no indication in the record that he did so because of his back condition.  (Def. 56.1 ¶ 39; Pl. 56.1 Ex. S at 68:6-11.)  A "great majority" of his patients were the same as before his disability, many of them long-term cardiology patients for whom he provided continuing care.  (Def. 56.1 ¶ 39; Pl. 56.1 Ex. V.)  After 2005, he was performing hospital rounds for 30

minutes each day and was on call every weekend.  (Def. 56.1 ¶ 39.)  He continued to supervise

the diagnostic laboratory.  (Pl. 56.1 Ex. S. 132:3-12.)

Plaintiff's inability to perform invasive procedures has not significantly affected his

income.  In 2003, the pre-disability year, he earned $3.35 million.  His income increased slightly,

to $3.7 million, in the first post-disability year, and then tapered to $3.19 and $2.85 million for

2005 and 2006, respectively.  (Def. 56.1 Ex. 12 at 6.)  The eventual earnings decline did not meet

the 20% threshold requirement for residual disability benefits.  Before and after the disability,

profits from the diagnostic laboratory accounted for a large portion of Hershman's income.  (Pl.

56.1 Ex. S. at 131:14-22.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the evidentiary record shows that "there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(c).  An issue of fact is genuine if "a reasonable jury" could decide it

in favor of the non-movant.  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A fact is "material" if it "might

affect the outcome of the suit" under controlling law.  *Ricci v. DeStefano*, 530 F.3d 88, 109 (2d

Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).  The movant bears the burden to show that no

genuine issue of material fact exists.  *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d

241, 244 (2d Cir. 2004).  For summary judgment purposes, all evidence is to be construed in the

light most favorable to the non-movant, and every justifiable inference must be drawn in that

party's favor.  *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006).

**DISCUSSION**

The parties' motions present a single issue: whether Dr. Hershman's inability to perform invasive cardiac procedures renders him "totally disabled" under the policy.  Under New York law, which governs this diversity action, Hershman bears the burden of proving total disability. *Shapiro v. Berkshire Life Ins. Co.*, 212 F.3d 121, 124 (2d Cir. 2000).

The policy defines "total disability" as the inability "to perform the important duties of [the insured's] Occupation."  Courts applying New York law on summary judgment have construed substantially similar language to mean that an insured is totally disabled if "he or she is no longer able to perform the 'material' and 'substantial' responsibilities of his or her job." *Klein v. Nat'l. Life of Vt.*, 7 F. Supp. 2d 223, 227 (E.D.N.Y. 1998) (Trager, J.).  Put differently, an insured is totally disabled where his condition prevents him from performing work "of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties…." *Id.* (quoting *Blasbalg*, 962 F. Supp at 367); *London v. Berkshire Life Ins. Co.*, 71 Fed. Appx. 881, 884 (2d Cir. 2003) (applying the "same essential character" standard).  "The [total disability] question entails a 'fact-oriented, functional approach that look[s] to the professional activities in which the insured was regularly engaged….'" *Shapiro*, 212 F. Supp. 2d at 125 (quoting *Klein*, 7 F. Supp. 2d at 227).

Following this functional approach, courts have recognized that parties to occupational policies often intend to contract for insurance covering a particular specialty within a larger occupational field.  *See Blasbalg*, 962 F. Supp. at 368 (noting New York law's recognition of "the concept of specialization within a given occupational or professional calling…").  The significance of an occupational policy to a physician practicing exclusively as a surgeon, for example, is to insure her continued ability to conduct surgery.  *See Dixon v. Pac. Mut. Life Ins.*

*Co.*, 268 F.2d 812, 815 (2d Cir. 1959). A medical specialist will not be denied "total disability" coverage simply because she molds her training and education to another, less mechanically demanding field, even if the two practices have in common one or more "important" duties. *Nicolli v. Monarch Life Ins. Co.*, 332 N.Y.S.2d 803, 805 (Sup. Ct. 1972) (upholding total disability verdict for physician forced by heart attack to leave obstetrics/gynecology practice and become director of a hospital family planning and sex education unit, where he "continued to use his medical skills and knowledge").

On the other hand, where an insured practices a specialty but does not confine himself to it, the "total disability" analysis is similarly unconfined. *See Klein*, 7 F. Supp. 2d at 227. Thus, if a physician routinely performs surgeries but also devotes substantial time to a non-surgical practice, he is not totally disabled by an inability to operate. *Simon v. Unum Group*, 2009 WL 857635 (S.D.N.Y. Mar. 30, 2009). Put differently, an insured with two comparable "occupations" is not totally disabled if he can continue with one. *See Klein*, 7 F. Supp. 2d at 227. However, if the disability precludes performance of all but "incidental" duties, the insured is entitled to total coverage. *Shapiro*, 212 F.3d at 124 (finding disabled dentist's office administration work "incidental to his material and substantial duties as a full time dentist").

Defendants argue that another court in this district recently construed the definition of "total disability" more strictly. *See Simon*, 2009 WL 857635 at *5. In *Simon*, the contract defined "total disability" as the inability to perform "the substantial and material" duties of the insured's occupation. *Id*. at *1. Judge Scheindlin construed this language to require an inability to perform "*any* of the substantial and material" duties of the occupation. *Id*. at *5. Read in light of the prior case law, however, this standard corresponds to whatever critical mass of occupational tasks that, when stricken from a claimant's range of competence, forces him into a

position of a different essential nature.  In other words, an insured is unable to perform "any" of

the "substantial and material" or "important" duties of his occupation where his disability

precludes performance of a job of the same character.  *See Shapiro*, 212 F.3d at 124-26.  This

reading comports with the reasoning in *Simon*, which sought to avoid rendering superfluous the

contract's "residual disability" provision:

> [T]o be considered residually disabled, it must be determined that the insured is "not able to do
> one or more of [his] substantial and material daily business duties…."  When the policy is read as
> a whole, it can only be interpreted in one way.  If the residual disability provision is to be given
> meaning, an insured can only be "totally disabled" if he can no longer perform *any* of the
> "substantial and material" duties of his occupation.  An inability to perform one or more of those
> duties would only render an insured residually disabled.

*Simon*, 2009 WL 857635 at *5.  Both contract terms retain meaning under the established test: an

insured is "totally disabled" only where incompetent to perform work of the "same general

character," and is "residually disabled" by an inability to perform a particular duty or duties that

does not carry this consequence.  *See Klein*, 7 F. Supp. 2d at 227.  Read too broadly, *Simon*

would conflict with cases granting total disability benefits to injured specialists who carry over

certain skills and tasks from their discrete fields into new endeavors.[3]  *See Blasbalg*, 962 F.

Supp. at 366-69; *Primavera v. Rose & Kiernan, Inc.*, 670 N.Y.S.2d 223 (App. Div. 1998).

Thus, Dr. Hershman is totally disabled if his back injury prevents him from performing

work "of the same general character…requiring similar skills and training" as that which he

previously performed.  To the extent his pre-disability work encompassed more than one distinct

set of occupational duties—if he did, as defendants argue, practice both invasive and non-

---

[3]Different contract language may create a stricter standard, one that precludes coverage for transition between
specialties.  *See White v. Continental Cas. Co.*, 831 N.Y.S.2d 631, 631 (App. Div. 2007) (contract providing total
disability benefits only if insured cannot perform the "material and substantial duties" *and* is not engaged in "any
gainful occupation for which [he is] reasonably fitted by education, training, or experience"); *Klein v. Nw. Mut. Life
Ins. Co.*, 2009 WL 1940566, at *1 (2d Cir. July 2, 2009) (contract language precluding total disability "[i]f the
Insured can perform one or more of the principal duties of the regular occupation"); *but see Blasbalg*, 962 F. Supp.
at 368 ("[E]ven in those cases…where the policy precludes recovery if the policyholder can perform 'any' of the
duties of his profession or occupation, a 'reasonable interpretation' is required").

invasive cardiology, and if his non-invasive work was not "incidental" to his invasive surgeries— he is not totally disabled if he remains able to perform either occupation.

In Hershman's case, there is far too much continuity between his work before and after the onset of his back condition to sustain a "total disability" finding. Hershman prospered as a cardiologist then and he prospers as a cardiologist now. He works from the same office, sees many of the same patients, supervises the same multi-million dollar laboratory business, and earns roughly the same income.[4] Like before the back injury, he makes daily hospital rounds and is frequently on call. His inability to perform invasive procedures in the catheterization lab is the only professional consequence of his disability. By even the most favorable of Hershman's own, inconsistent statements, however, those procedures constituted not quite 50% of his pre-disability work duties. (Pl. Counter 56.1 ¶ 28 ("Plaintiff admits that…50% of his time was spent on invasive procedures in the hospital, rounds on patients in the hospital, and being on call."))[5] He devoted the rest of his time and attention to consultative cardiology, seeing patients in his Lake Success office. At best, then, plaintiff was a cardiologist with two sets of duties, consultative and invasive. His undisputed ability to continue performing the second means that he is not totally disabled. *See Klein*, 7 F. Supp. 2d at 227-28; *Simon*, 2009 WL 857635, at *5. This legal conclusion remains the same regardless of whether one characterizes Hershman's consultative and invasive activities as separate "occupations," or whether one considers the

---

[4] The absence of a material change in the insured's net income does not preclude total disability coverage where that income is generated by a new occupation. *Shapiro*, 212 F.3d at 125. However, trends in net income are relevant to the question of whether the insured's disability actually caused a change in occupations. *See id*. In Hershman's case, the fact that his income rose slightly in the first post-disability year tends to discredit his argument that he changed occupations at that time.

[5] These figures are not supported by any evidence other than Hershman's own statements. (Pl. Counter 56.1 ¶ 28.) A reasonable reading of the record, construing the facts in Hershman's favor, indicates that he spent no more than 25 hours per week in the hospital, where he devoted most but not all of his time to invasive procedures, compared to 32 hours per week in his office. (Def. 56.1 ¶ 30; Pl. Counter 56.1 ¶ 28.) Even these figures are more generous than plaintiff's own prior statement. (Def. 56.1 ¶ 28 (40 hours in office and 28 hours in hospital).) Because the difference does not change the legal outcome, however, the Court chooses to credit plaintiff's uncorroborated figures.

consultative duties a piece of the same occupation that, by virtue of the considerable time and

attention they demanded, cannot be considered "incidental" to the invasive work.  *See Klein*, 7 F.

Supp. 2d at 227.

That plaintiff continues to oversee his diagnostic laboratory business is also relevant to

the total disability analysis.  (Def. 56.1 ¶ 39.)  Hershman argues that he was "merely the owner

of the facility" and that, because he did not personally perform any medical testing in the lab, its

operations were not an aspect of his pre-disability occupation.  (Pl. 56.1 ¶ 25.)  While procedures

performed exclusively by other employees cannot be imputed to Hershman, his administration of

the business certainly should be.  By his account, the lab generates annual revenues of between

four and six million dollars.  (Pl. Counter 56.1 ¶60; Def. 56.1 Ex. 23.)  It employs fourteen

people, operates out of his office, and does work almost exclusively for his patients.  (Pl. 56.1

Ex. S at 23:13 – 24:8.)  Hershman acknowledges that he was and continues to be the lab's sole

owner and "supervisor."  (Pl. Ex. S at 132:3 – 133:5.)  Given his own emphasis of the scope of

the laboratory operation, it would be unreasonable to conclude that this supervisory role did not

comprise a portion of his "important" pre-disability duties.  *See Klein*, 7 F. Supp. 2d at 228

("[M]anagement of a health care facility by a health care professional may well constitute an

occupation separate and apart from that of the health care practitioner").

Hershman cites no cases applying New York law that find an insured "totally disabled"

where he is able to continue performing such a substantial portion of his pre-injury professional

duties.  The factual dissimilarity of the cases he does cite undermines his argument.  *See Shapiro*,

212 F.3d at 121 (dentist unable to perform any of the chair dentistry that comprised 90% of his

occupational duties); *Blasbalg*, 962 F. Supp. at 362 (computer programmer fired because vision

impairment prevented performance of three-quarters of his work duties); *Niccoli v. Monarch Life*

*Ins. Co.*, 332 N.Y.S.2d 803 (Sup. Ct. 1972)(physician forced by heart attack to leave

obstetrics/gynecology practice and become family planning and sex education specialist);

*Primavera v. Rose & Kiernan, Inc.*, 670 N.Y.S.2d 223 (App. Div. 1998)(managing partner at

accounting firm resigned due to heart condition, began working as law firm office manager at

reduced salary); *Mowers v. Paul Revere Life Ins. Co.*, 27 F. Supp. 2d 135 (N.D.N.Y. 1998)

(chiropractor ceased work entirely due to lower back injury); *see also Dixon v. Pac. Mut. Life

Ins. Co.*, 268 F.2d 812 (2d Cir. 1959) (Arkansas law) (hand ailment caused physician to cease

exclusive surgical practice).

 Hershman argues that there is at least an issue of fact as to whether his pre- and post-

disability consultative duties are essentially different in nature.  He says most of his current

patients receive only non-invasive care, whereas previously he primarily saw candidates for

invasive procedures.  The two types of consultations are as different, claims Hershman, as client

meetings held by mergers and acquisitions lawyers, on the one hand, and traffic court lawyers,

on the other hand.  (Pl. Opp. Br. at 23.)  The record does not support this argument.  Though

plaintiff cites statistics purporting to show that he shifted from "invasive" to "non-invasive"

consultations, he does not articulate how the medical skills applied in the two types of

consultations differ.  (Pl. 56.1 Ex. V.)  Rather, his deposition testimony indicates they are

essentially the same.  (Pl. Ex. S at 47:20 – 48:9 (describing post-procedural visits as "general

cardiology on an invasive patient"), 84:25 – 85:6.)  Additionally, if Hershman had switched into

a specialty that did not comprise more than an incidental portion of his prior practice, one would

expect to observe signs of professional transition.  Hershman, however, moved with astounding

ease from his pre- to post-disability work.  The first Tuesday after he decided to cease invasive

procedures, he filled his office schedule with thirty-six patient visits (Tuesday had previously

been his hospital day).  (Def. 56.1 ¶ 50.)  He continues to see many of the same patients as before

the disability.  (Pl. 56.1 Ex. V.)  He submits no evidence showing a temporary decline in the

income attributable to his consultative practice, and defendants' evidence indicates that it in fact

remained constant.  (Def. 56.1 Ex. 23.)  Given this evidentiary record, no reasonable jury could

conclude that plaintiff's pre- and post-disability consultative practices were essentially different

in character and that plaintiff had become "totally disabled" under the terms of his policy.

Finally, Hershman argues in his motion papers that defendants are engaged in a broad

scheme to improperly "scrub" occupational disability claims from their books.  (Pl. 56.1 ¶ 47.)

He cites cases from other jurisdictions upholding jury verdicts against these defendants for bad

faith claim terminations.  (Pl. Br. 18 – 20.)  The complaint in this action, however, does not

include any allegations of bad faith, nor does plaintiff offer any evidence that defendants acted in

bad faith in *this* case.  The bad faith cases are therefore irrelevant.  Hershman also contends that

the total disability payments defendants made between August 2004 and December 2005

constitute "repeated admissions" of the merit of his claim.  (Pl. Br. at 1.)  But uncontroverted

evidence that defendants made the payments subject to a continuing investigation and under a

reservation of rights frustrates this argument, (Pl. 56.1 Ex. M, N), as does the lack of any genuine

factual issue in the underlying record as to the invalidity of the total disability claim.


**CONCLUSION**


For the reasons stated above, defendants' motion **[53]** is granted and plaintiff's motion **[33]** is

denied.  The Clerk of the Court is directed to close this case.


13

SO ORDERED.

Dated: New York, New York
       September 25, 2009

Richard J. Holwell
United States District Judge